KHOUZAM, Judge. Alex C. Baez appeals his conviction and sentence for first-degree murder. Because the court erred in excluding portions of jailhouse informant Rico Cielo’s testimony and we cannot say that the error was harmless, we reverse and remand for, a new trial. Baez was found guilty of the murder of Jose Santos, also known as “Sugarbaby.” Santos disappeared on the night of November 6, 2012. At the time, he had been staying with his girlfriend, Barbara Pan-dolfo, and her family—which included her brother, Charles Pandolfo. Santos left the residence after getting into an argument with Barbara, and he never returned. Several days later, on November 11, Santos’ body was discovered buried in a nearby orange grove. He had been shot in the back of the head. The murder weapon was never found. The debris in the grove was checked for fingerprints, but none were found. The State’s theory of the case was that Baez had committed the murder with Charles Pandolfo’s help. The defense’s theory, on the other hand, was that Charles had committed the murder alone and met up with Baez afterwards to go on a drive and smoke marijuana. Much evidence was presented that could have been interpreted to support either of these theories. A surveillance video of the entrance of the neighborhood from the night of the crime was introduced. The video showed someone—identified by Santos’ cousins as Charles Pandolfo—wearing a hoodie, holding a bag, and walking around the neighborhood shortly after 2:00 a.m. on November 7. The video then showed what appeared to be Charles’ car make a U-turn in front of the gate and after that what appeared to be Baez’s car driving toward the Pandolfo residence. Santos’ cousins were particularly concerned by the surveillance video because members of the Pandolfo family repeatedly told them that they had all been in bed by 1:00 a.m. that night. Santos’ cousins testified that they searched the orange grove with Barbara and Charles Pandolfo, looking for the victim. They indicated that Charles’ behavior was suspicious because he did not appear to be seriously looking and he shooed them away from a specific area. According to Santos’ cousins, the Pandolfos did not approve of the relationship between Santos and Barbara. The cousins described the relationship as toxic and violent. A neighbor of - the Pandolfos testified that he was outside smoking a cigarette between 2:00 and 3:00 a.m. on November 7 when he saw Santos and another man walking down the street. They walked between two houses toward the orange grove. The neighbor—who did not know Charles Pandolfo but was familiar with Baez from around the neighborhood—did not recognize the man walking with Santos but believed the man was wearing a-hood-ie. At about 10:30 a.m. the next morning, the neighbor walked through the orange grove on his way to work. He noticed a big patch of fresh dirt marked like a grave with a wooden cross. He thought a dog may have been buried there. The patch of dirt had not been there the day before. Another neighbor testified that she saw Charles Pandolfo physically attack Santos in. September 2012, approximately two months before the murder. Santos had walked to the neighbor’s house from the Pandolfo residence. The Pandolfos suddenly pulled up in a car. Charles ran at Santos, attacking him and stabbing him with a screwdriver. Barbara held Santos to the ground^ and Charles was on top of him. When the neighbor tried to break up the' fight, Charles and Barbara’s mother pulled her back by the hair. Baez’s sister testified that on the night of the murder she was hanging out with Baez at his apartment. Between 12:00 a.m. and 1:00 a.m., Charles—who was a friend of hers—began texting her that he was at a breaking point, that he felt like he was going crazy, and that he was involved in a situation he could not control. She later became aware that Baez was on the phone with Charles. Baez appeared a little bothered, but it was nothing out of the ordinary. She believed his change in demeanor may have been because he and. Charles had previously had a falling out. After they hung up, she texted Charles, telling- him not to do anything stupid. She was concerned because she knew that Charles and Santos had at one point gotten into a physical fight; however, she never suspected that Charles would commit murder. At around 2:00 a.m,, Baez drove his sister home. Baez’s sister also testified that her brother sold marijuana with Wilfredo Diaz and Mark-; .Rodriguez. Baez would often take Charles Pandolfo on “J-rides”—a term for driving around and smoking marijuana. Similarly, Mark Rodriguez testified that he,-: Baez, and Diaz had formed a business partnership to sell marijuana. They had a meeting after Santos went missing and resolved to ‘stay away from the Pandolfos’ neighborhood because of the increased police presence. None of the partners made any kind of admission that they were involved in Santos’ disappearance—they decided to stay away from the area only because they were involved in the sale of .illegal drugs. •' After Baez was arrested, he' called Rodriguez from jail and asked him to “clean up.” According to, Rodriguez, this was a request for him to take care of the group’s marijuana plants and business dealings. Immediately after Baez made this request, Rodriguez and Diaz went to their marijuana patch and “cleaned up.” Baez contacted Rodriguez instead of Diaz because Baez had recently had a falling out with Diaz. Records from Charles Pandolfo’s cell phone showed a number of incoming calls from and outgoing calls to Baez’s number between approximately 1:00 a.m. and 10:00 a.m. on November 7. There were also text messages between the two numbers during-this timeframe. A note was also written in the note-taking application on Charles’ cell phone at 4:13 a.m. on November 7 stating: “I feel a whole new darkness. I can’t believe this shit. Please lord forgive me for my sins. Please lord watch over my family,. Please lord ... I’m sorry.” The phone data showed that in the days following Santos’ disappearance, Baez; text-ed Charles several times to tell .him to lay low. On November 9, Baez texted Charles: “Bruh, they have choppers out here and all that. I’m on my way to your house.” On November 10, Baez texted Charles: “Man, stay ducked out of here like I told you. Don’t let nobody know you out in Polk .,. Nobody. Anybody hit you up, you in Tampa.” Later on November 10, Baez texted Charles: “Just talking about the video, telling them how you was coming to my house to fuck, but she canceled, so you went back home. Honestly they think it’s yo sister, bro.” The phone data also included an October 5, 2012, voice message from Baez to Charles asking whether Charles was still looking for a pistol and offering to connect him with someone who was selling one. Texts between Baez and one of Santos’ cousins were introduced into evidence. After searching the orange grove :on November 7, Santos’ cousin texted Baez that she had a feeling that Charles did something to Sugarbaby. She said Charles was acting funny. She felt like he was lying to her face, and Charles and Barbara were switching stories. “And he would do something because he stabbed my cousin before,” she said. “If my cousin shows up missing, dead, I swear to God,'shit gone get real.” She asked Baez to tell her if he found out that Charles did something. These texts had been deleted on Baez’s phone, but investigators were able to recover them. ■ In addition to all of this evidence that could have been'interpreted to support either the State’s - or the defense’s version of events, each side had a key witness whose testimony was the crux of its ease. Both of these witnesses claimed that the killer had confessed to them. The conflicting testimony from these two witnesses was by far the strongest'evidence presented at trial. . ■ ■ -, - The State called Wilfredo Diaz, who'had known Baez for several years. He stated that they would smoke marijuana together. One day Diaz went to Baez’s apartment to purchase marijuana, and the topic of someone named “Sugarbaby” came up. Baez told Diaz that they had gone to high school together, but Diaz did not remember him even after Baez pulled up a picture on Facebook. Baez told Diaz that he and Charles Pandolfo—who Diaz knew as an acquaintance—had killed Sugarbaby.,Baez told Diaz that Sugarbaby was in,an abusive, relationship with. Charles’ sister and had also attempted to sexually assault Baez’s girlfriend. Baez and -Charles dug a hole in . the orange grove, and Charles lured the victim there by asking for-his help disposing of a shotgun in the grove. Baez hid near the hole until they arrived. He then sneaked up behind the victim- and shot him in the head. The body fell into the hole, they covered it with dirt, and they left. The gun was- dismantled, and Baez disposed of it in lakes around the Orlando area. Diaz also testified that he helped Rodriguez destroy some marijuana plants about a Week after Baez told him about the murder. The defense called Rico Cielo, who had formed a relationship with Charles Paridol-fo when, for about twelve days, they were placed in isolation'together at Polk County Jail due to a shared medical ailment. During this time, Charles told Cielo that he had , committed the perfect murder. Charles told Cielo that he had killed Santos, who he called “Sugarbaby,” after finding out that Santos was going to move to Kissimmee with Charles’ sister. The murder took place during the early morning hours of November 7. The day before, Charles dug a hole in the orange grove deep enough for a body. He then asked Sugarbaby for help disposing of a gun by burying it in the orange grove. They waited until everyone in the Pandolfo residence was asleep before setting off toward the orange grove. Charles had a gun in the pocket of his hoodie jacket. Sugarbaby stopped briefly to talk to a man wearing a black hoodie, but Charles kept walking toward the grove, and Sugarbaby caught up with him. As they entered the grove, Sugarbaby started complaining that sand was getting in his slides and that his feet were getting dirty. Once they arrived at the hole, Sugarbaby looked down into it and Charles shot him. Charles saw the flash from the gun, and Sugarbaby fell to the side of the hole. Charles looked down at Sugarbaby and could hear him gurgle, then take his last breath. Charles dragged the body by the feet into the hole and buried it with a shovel that he had left nearby. After he filled in the hole, he saw some dark spots of blood, so he made sure to get rid of those. He tamped down and smoothed out the dirt on top of the grave and then walked home in a different direction in case someone had seen him on the way there. Despite recounting the murder in such vivid detail, Charles did not mention anyone else being involved in the killing. He never said that there was anyone lying in wait near the hole or that anyone else shot Sugarbaby. As soon as he got home, Charles put his clothes and the gun in separate bags and hid them in the garage. He then went inside and deleted messages off of a phone that Sugarbaby had left at the house. He went upstairs and put on a fresh set of clothes. Because he was nervous about what he had done, he decided to go get a pack of cigarettes. But as he was driving away, he realized that he left the shovel at the gravesite. So he made a U-turn and went back to retrieve the shovel. He took it home, cleaned bloodstains off of it, put it on top of a cabinet in the garage, and covered it with some bags. He decided not to go out again because he did not want to arouse the neighbors’ suspicion. But he convinced a friend to come over and bring him marijuana. The two of them went cruising around, smoking a joint to relax. Further testimony from Cielo was excluded but proffered outside the jury’s presence. In the proffered testimony, Cielo stated that Charles told him that he was getting away with the perfect murder: A. He just said that—he told me that they got the wrong person. He said, they’re fucking idiots, Grady Judd and his detectives are some fucking idiots, he goes. He goes, my lawyer told me all I have to do, Rico, is just keep my fucking mouth shut and I’ll get away with this. Charles never told Cielo who the “wrong guy” was, but he did clarify as follows: Q. When he says he got the wrong guy, was he trying to tell you—or did you accept that he was trying to tell you that there was somebody else involved and they got the wrong guy or they just got the wrong guy because they haven’t charged him? A. They got the wrong guy because they didn’t charge him. Baez argues on appeal that the trial court erred in excluding this proffered testimony from Cielo. We review a trial court’s eviden-tiary rulings for an abuse of discretion, but the trial court’s discretion is limited by the rules of evidence. Masaka v. State, 4 So.3d 1274, 1279 (Fla. 2d DCA 2009). Section 90.804(2)(c), Florida Statutes (2012), creates a hearsay exception for statements against interest made by an unavailable declarant: (c) Statement against interest.—A statement which, at the time of its mak-mg, was so far contrary to the declar-ant’s pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant’s position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement. “The Florida Supreme Court has held that the test for admissibility under this section is (1) whether the declarant is unavailable, and if so (2) whether the statements are relevant, (3) whether the statements tend to inculpate the declarant and exculpate the defendant, and (4) whether the statements are corroborated.” Masaka, 4 So.3d at 1279. Under prong (4), the trial court must consider whether the circumstances surrounding the statement suggest that it is trustworthy and whether the statement is consistent with the defendant’s theory of the case as well as the other evidence presented at trial. Id. at 1282. Where proffered testimony meets these admissibility requirements, it is up to the jury to determine its weight. Id. at 1279. Here, it is undisputed that prongs (1) and (2) were met. The court declined to admit the proffered testimony based on prongs (3) and (4) because Charles did not identify the “wrong guy.” But to satisfy prong (3), a statement does not need to amount to a full confession by the declarant and a complete exoneration of the defendant; rather, the statement must, when taken in context, be against the declarant’s interest and tend to exculpate the defendant. See id. at 1281-82. Because Baez was indeed arrested and charged for the murder, Charles’ statement that the police had, the “wrong guy” certainly tended to exculpate Baez. And the statement was sufficiently inculpatory because it was made in the context of Charles saying that he was going to get away with the perfect murder—thus implying that he was the one who committed the crime. The proffered testimony was- also sufficiently corroborated' as required under prong (4). First, the circumstances .of Charles’ statement to Cielo were sufficiently trustworthy to go to the jury. Cielo and Charles were isolated together in jail for twelve days. During that time, they got to know each other and had ample opportunity to talk in confidence. The statement was clearly against Charles’ own interest because it exposed him to criminal liability. Second, the statement was consistent with the defense’s theory of the case, which was that Charles had committed the murder alone and that Baez met up with him afterwards to go on a “J-ride.’’ Much of the evidence presented could have been interpreted to support this theory. For example, the surveillance video appeared to show Charles walking and driving around the neighborhood during the time-frame that Santos went missing. Though Baez’s car is also seen on the video, he could have merely been giving Charles a “J-ride.” A neighbor saw Santos walking through the neighborhood toward, the orange grove with an unknown male, who could have been Charles. This person was wearing a hoodie,- as Charles was in the surveillance video. Another neighbor had observed Charles attack Santos, stabbing him with a screwdriver, about two months prior to the murder. Several witnesses stated that Charles did not like Santos because Santos was abusive toward Charles’ sister, Barbara. Phone records revealed notes, messages, and texts suggesting that on the night of the crime, Charles was extremely distraught, felt he was in an out-of-control situation, and asked God for forgiveness for his actions. These records also showed that Charles was looking to buy a gun about a month before the murder and was hiding from the police in the days following Santos’ disappearance. This evidence could have been interpreted to support the statement that the police had the “wrong guy.” Because the proffered testimony met the admissibility requirements, it was error for the.trial court to exclude it from the jury’s consideration. And finally, we cannot say that the error was harmless. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986) (“The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict dr, alternatively stated, that there'is no reasonable possibility that the error contributed to the conviction.”). Cielo’s testimony at trial that Charles had confessed to the shooting left open the. possibility that Baez was ah accomplice, The excluded testimony went one step further by clearly suggesting that the police had “the wrong guy.” Accordingly, we cannot say beyond a reasonable doubt that the erroneous exclusion of this testimony did not contribute to the verdict, and we must reverse and remand for a new trial. Reversed and remanded. VILLANTI and SLEET, JJ., Concur.